# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

GREGORY BRYANT,                    *
                                   *
    Plaintiff,             *
                                   *
    v.                     *                    CV 514-101
                                   *
PILGRIM'S PRIDE CORPORATION,       *
                                   *
    Defendant.             *

## **ORDER**

Plaintiff, a Black male, filed this race discrimination action after Defendant terminated his employment at its poultry processing facility. Dkt. No. 1. Presently before the Court is Defendant's Motion for Summary Judgment (dkt. no. 17), which the parties have fully briefed. See Dkt. Nos. 18, 22, 27. For the following reasons, Defendant's Motion (dkt. no. 17) is **GRANTED.**

AO 72A
(Rev. 8/82)

## BACKGROUND[1]

Plaintiff worked at Defendant's poultry processing plant (the "Plant") in Douglas, Georgia, from 1986 to 2009. SUF, ¶¶ 1-2. In May 2009, Defendant shut down the Plant completely and laid off all of its approximately 800 employees, including Plaintiff. Id. at ¶¶ 1, 3. Defendant offered Plaintiff a comparable job at another one of its facilties in Live Oak, Florida, but Plaintiff declined the offer. Id. at ¶ 5. Plaintiff does not allege to have suffered any unlawful discrimination or harassment based on his race during this initial period of employment. Id. at ¶ 4.

Defendant reopened the Plant in Douglas, Georgia, in 2010. Id. at ¶ 6. Plant Manager Ralph Baker ("Baker"), a White male, interviewed and hired Plaintiff for a supervisory position at the Plant beginning in October 2010. Id. at ¶¶ 6-7. From October 2010 to January 2011, Plaintiff worked as Debone Supervisor and also assisted the personnel department in hiring staff for the reopened Plant. Id. at ¶¶ 8-9.

---

[1] Defendant has filed a Statement of Material Facts (dkt. no. 17-1), and Plaintiff has filed a Response (dkt. no. 25) largely agreeing with Defendant's recitation of the facts of this case. Accordingly, the Court, for ease of exposition, cites only to Defendants' version of the facts (dkt. no. 17-1) as the Statement of Undisputed Facts ("SUF") and specifically notes herein any facts with which Plaintiff disagrees. Additionally, Plaintiff has filed a separate Statement of Disputed Material Facts (dkt. no. 23), and, to the extent that Defendant's Reply (dkt. no. 27) raises no objection thereto, the Court treats these facts as undisputed and relies upon the same to supplement the SUF as set forth herein.

In January 2011, Plaintiff transferred to the position of Production Supervisor in the Plant's "cut-up, leg quarter, chiller, and re-hang department." Id. at ¶ 9. In this position, Plaintiff was responsible for ensuring that the department's production line "maintained the proper flow of chickens through the processing and production process"—which included keeping the chickens chilled while they were cut up, assessed by United States Department of Agriculture ("USDA") officials and quality assurance personnel, and then sent forward to the packaging area. Id. at ¶¶ 9, 12. Plaintiff supervised roughly forty to fifty employees in his department during any given shift. Id. at ¶ 10. He remained in this position until his termination on July 19, 2012. Id. at ¶ 11.

## I. Regulations and Policies for Operating the Plant

As a food processing facility, the Plant is subject to oversight and regulation by the USDA and the Food Safety and Inspection Service ("FSIS"), a department within the USDA. Id. at ¶¶ 12-13. The FSIS requires that USDA personnel inspect and grade any meat that is produced. Id. at ¶ 13. Consequently, USDA employees are physically present at the Plant to monitor operations and ensure compliance with USDA and FSIS rules and regulations. Id. at ¶ 14.

USDA personnel work twelve-hour shifts, and Defendant may operate production lines at the Plant only when such personnel

AO 72A
(Rev. 8/82)

are physically present to oversee operations. Id. at ¶¶ 14-15. Plaintiff's department thus had to have all of the product off of the floor at the end of the USDA personnel's shift and could not run its processing line after that time. Id. at ¶ 15. If Defendant were to run any of the Plant's production lines after the USDA-mandated stop time, it could face severe consequences—such as a fine, a shutdown of the Plant, or an order to destroy any chickens processed after the stop time and thus forfeit thousands of dollars in lost product. Id. at ¶ 16.

Defendant's employee handbook emphasizes that "[c]ompliance with company safety policies, rules and regulations is a condition of employment." SUF, Ex. 1 ("White Aff."), ¶ 25 & Ex. C. A violation of a policy, rule, or regulation "may be subject to disciplinary action, up to and including termination." Id. at Ex. C, p. 22. The handbook further provides that "[m]anagement is responsible for modeling, maintaining and enforcing safe work practices and conditions." Id. Defendant requires each employee to whom it distributes the handbook to sign an acknowledgment confirming his or her receipt thereof and agreement "to abide by and follow all company rules and policies." Id. at Ex. C, p. 29.

On or around March 14, 2011, Plaintiff and other supervisors at the Plant signed documents stipulating that they had attended various meetings at which they discussed product

AO 72A
(Rev. 8/82)

rotation and that issues therewith would "result in disciplinary action and up to discharge." SUF, ¶ 20; Dkt. No. 25, ¶ 20.[2] On April 22, 2011, Defendant issued Plaintiff a written memorandum specifying the requirements and expectations of him as Production Supervisor, including that he was to comply with the USDA and FSIS time limit for finishing all operations and having all of the product off of the floor in his department. SUF, ¶ 21. The memorandum concluded, "By signing this you understand the expectation as stated above and that improvement in this area is expected and will be evaluated weekly." Id. Plaintiff signed the memorandum, acknowledging his receipt of the document and agreement with its content. Id.

On several occasions, including on May 4, 2011, Plaintiff had conversations with his supervisor about "the need for Plaintiff to comply with USDA and quality assurance . . . requirements in his department." See id. at ¶ 22; Dkt. No. 25, ¶ 22.[3] Defendant has produced internal memoranda dated May 5 and 16, 2011, neither of which identifies or contains a signature of its author but which both Plaintiff and Defendant believe to have been written by Plaintiff's supervisor and Shift Manager at

---

[2]  While Defendant contends that Plaintiff was counseled regarding these issues, SUF, ¶ 20, Plaintiff asserts that he and the other supervisors were simply asked to sign documents acknowledging that they had attended meetings at which such counseling took place, dkt. no. 25, ¶ 20.

[3]  According to Plaintiff, these conversations took place because his supervisor did not understand the process. Dkt. No. 25, ¶ 22.

the Plant, Tammy Gardino ("Gardino"). See SUF, ¶ 23; Dkt. No. 25, ¶ 23; Dkt. No. 20 ("Pl.'s Dep."), 68:18–69:8, 70:18–24, 72:24–74:5. The May 5, 2011, memorandum states that the author had had disagreements with Plaintiff regarding the operations of his department; that his department had been getting backed up; that another employee had reported that Plaintiff had not been on the floor during some of the backups; and that Plaintiff, in turn, had issued a verbal warning to this employee for not carrying out his duties in a timely manner. SUF, ¶ 23. In the May 16, 2011, memorandum, the author purports to have "repeatedly told" Plaintiff not to run past the cut-off time. Id. at ¶ 24.[4]

Sometime shortly before July 18, 2012, Defendant held one or more meetings with Plaintiff and other supervisors to reiterate "the absolute importance of ensuring that all operations on the chicken production line were completed and all product off of the production floor prior to the USDA-mandated cut-off ti[m]e." Id. at ¶ 25. With regard to the cut-off time, Plaintiff has since testified, "We had meetings about that. . . . Everybody knew. Supervisors knew." Id. (alteration

---

While Defendant represents that Gardino wrote the statements set forth in these memoranda, SUF, ¶¶ 23–24, Plaintiff denies these facts only insofar as the memoranda do not reference or contain signatures of the author or an acknowledgement that Plaintiff ever received or reviewed the same, dkt. no. 25, ¶¶ 23–24. It thus appears that Plaintiff disputes neither the existence nor contents of these memoranda, but that a factual dispute exists as to the author or authors thereof.

AO 72A
(Rev. 8/82)

in original). Plaintiff also has acknowledged that at these meetings, Defendant informed him that "if operations were not completed by the USDA required time, the [P]lant could be shut down altogether." Id. at ¶ 26.

In the days just prior to July 18, 2012, Defendant issued a mandate stating that all members of the processing management team, which included Plaintiff, were to have completed production and be off of the production floor by 6:30 PM to comply with USDA and FSIS requirements. Id. at ¶ 19. Defendant informed Plaintiff of the consequences to the company and to him individually if operations were carried out in violation of USDA and FSIS regulations. Id.

## II. Operational Issues at the Plant

Jeff Moss ("Moss"), a White male, was Shift Manager at the Plant and took over Plaintiff's duties on one occasion while Plaintiff was on vacation. Dkt. No. 23, ¶ 8.[5] Plaintiff has testified that while under Moss's supervision, his department did not get the chicken off of the floor on time, and the USDA shut down the Plant. Pl.'s dep., 96:22-97:6. Moss was not terminated, dkt. no. 23, ¶ 8, but Defendant held a meeting upon Plaintiff's return from vacation, at which Moss, Plaintiff, and

---

[5] Defendant's briefing refers to this individual as "Jeff Maas," see, e.g., dkt. no. 27, p. 7; however, as Defendant has not objected to Plaintiff's factual statement on the matter, the Court uses the designation as it appears therein.

AO 72A
(Rev. 8/82)

others discussed the incident and strategies to prevent its reoccurrence, Pl.'s dep., 98:11-99:1.

Plaintiff also has testified that Vanessa Smith ("Smith"), a White female in the packaging department, once put the wrong dates on packages of meat. Pl.'s Dep., 122:16-123:5.[6] Defendant had to recall the truck carrying these meat packages and redo the labels before sending the packages back out for delivery. Id. at 123:10-11. Smith was not terminated as a result of this incident. Dkt. No. 23, ¶ 9.

At some point in time, Plaintiff's department began running past the USDA time limit. Id. at ¶ 3. Plaintiff consistently reported to management the issues that he believed to be causing the backups, including production delays in other departments as well as problems with the hangers in his department. Id. at ¶¶ 3, 10-11. According to Plaintiff, management disregarded these reports without taking any corrective action, but gave Plaintiff a high performance review and a bonus in 2012 partially due to these efforts. Id. at ¶¶ 5, 7, 11.

In July 2012, Plaintiff was working the "first shift," which ran from 8:30 AM to 6:30 PM, at which time Plaintiff needed to have the production line in his department completely shut down. SUF, ¶ 17. On July 13, 2012, Plaintiff's department

---

[6] At his deposition, Plaintiff admitted that he was unsure whether Smith made this error, or whether it was the other employee who was authorized to print date labels. Pl.'s Dep., 122:25-123:4.

came very close to running operations past the cut-off time. Id. at ¶ 27. On July 18, 2012, the product flow in this department backed up severely, resulting in product falling onto the floor and needing to be discarded. Id. at ¶ 28. Plaintiff continued to run operations past the USDA time limit on this day, and the USDA shut down the Plant as a result. Id.

### III. Investigation into the July 18, 2012, Incident

The Plant's upper management launched an investigation into the circumstances that caused or contributed to the July 18, 2012, shutdown. See id. at ¶¶ 34-36. Complex Manager David White ("White"), who is a White male, White aff., ¶ 5, instructed Baker and Human Resources Manager LaRahn Phillips ("Phillips"), who is a Black female, to interview witnesses and determine what had happened, whether any employee was at fault, and what could be done to address the situation, SUF, ¶ 35.

Plaintiff is not personally aware of what Defendant's upper management did to investigate the incident or whom they interviewed regarding the incident. Id. at ¶ 34. Nevertheless, he has since maintained that the incident was the fault of other individuals, including those who designed the Plant, as well as supervisors and workers in other departments. Id. at ¶ 29. For example, Plaintiff has cited the Manager of the evisceration department, whom he had approached shortly before the July 18,

2012, incident, about operations in that department repeatedly running late. Id.

Management, however, determined from their investigation of the incident that, in their opinion, the following had occurred:

> Plaintiff had disregarded certain directions that had been given to him regarding operations in his department[;] he had failed to properly follow certain standard operating procedures, policies and USDA directives[;] he had failed to properly notify USDA/FSIS and [c]ompany officials of the impending crises[;] and that he had further failed to take proper ownership of the situation as events unfolded and thereafter.

Id. at ¶ 36. Management found that, in their opinion, "[Plaintiff's] decision to continue to run outside of USDA and [c]ompany guidelines, and his failure to inform the USDA in advance of the issue, resulted in thousands of dollars of product being wasted." White Aff., ¶ 15. Management concluded that the incident on July 18, 2012, "was a chaotic situation that could have been better handled and managed by Plaintiff . . . . particularly . . . because the very circumstances at issue (not running past [the] cut-off time) had just been discussed with Plaintiff several times in the days just prior to July 18, 2012." SUF, ¶ 37.

The Plant's senior management wrote a letter to USDA and FSIS on July 19, 2012, with the subject line, "Exceeding 12 hours on 7/18/12." Id. at ¶ 32. The letter summarized the events that had taken place in Plaintiff's department on the

AO 72A
(Rev. 8/82)

previous day, including that "the leg quarter area still had product on the line at and after 1830 [the USDA-mandated stop time]." Id. (alteration in original). The letter noted that "mistakes were made by management not properly communicating to FSIS that working past the cut-off time was a real possibility and having quality assurance wait until the last moment to act." Id. at ¶ 33. The letter outlined certain operational changes that would be made to prevent such mistakes in the future and concluded with a plea for the USDA to agree to resume inspections so that production at the Plant could continue. Id. Defendant required that all management, including Plaintiff, sign the letter to acknowledge the significance of the problems and to reflect their commitment to executing all necessary corrective actions. Id.

## IV. Plaintiff's Termination and Administrative Action

In a meeting on July 19, 2012, Baker and Phillips informed Plaintiff of management's decision to terminate his employment at the Plant. Id. at ¶ 38. As to the reasons for his termination, White has since explained that "[e]ven though [Plaintiff] had previously been a good, long-term employee in general, [management] felt that the circumstances were serious enough that it warranted his immediate termination." White Aff., ¶ 22. White has further stated that, "The circumstances leading up to [Plaintiff's] termination were unique. To my

AO 72A
(Rev. 8/82)

knowledge, no similar instances had occurred previously, particularly right after management had been told not to let this happen." Id. at ¶ 23. Notably, White began working at the Plant in 2011. Id. at ¶ 3.

Phillips, whose employment at the Plant likewise began in 2011, has similarly indicated that she is "not aware of any similar situations prior to this where a supervisor, who had just recently been warned against letting his line under his direct and regular supervision run past the cut-off time, allowed his line to run [past] the cut-off time, causing the [P]lant to shut down." Dkt. No. 27, Ex. 1 ("Phillips Decl."), ¶¶ 2, 5. Specifically, Phillips has represented that she is "unaware of [Moss] running a production line past the USDA cut-off time or otherwise engaging in any situations similar to the events that lead to [Plaintiff's] termination." Id. at ¶ 6. Nor is she "[]aware of . . . Smith engaging in any misprint of labels incident." Id.

As to their meeting to terminate Plaintiff, "[n]obody told Plaintiff that he was terminated by [Defendant] because he is [B]lack." SUF, ¶ 42. "Nobody said or indicated anything to Plaintiff that his race was a factor at all in the [c]ompany's decision to terminate his employment." Id. at ¶ 43. Nor had Plaintiff ever gone to the human resources department or to upper management during his employment to complain of any kind

AO 72A
(Rev. 8/82)

of discriminatory or harassing treatment of him based on his race. Id. at ¶ 45.

Nevertheless, Plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 16, 2012. Id. at ¶ 39. Plaintiff stated in the EEOC charge that he "was told by . . . Baker (White), Plant Manager, that [he] was discharged due to failure to leave the floor on time." Id. at ¶ 40. Plaintiff asserted, however, that he was discriminated against because he was terminated on the basis of his race. Id. at ¶ 39. Plaintiff subsequently received a notice from the EEOC, dated September 4, 2014, informing him of his right to sue. Dkt. No. 1-2.

## V. **Plaintiff's Causes of Action**

Plaintiff filed a Complaint against Defendant in this Court on December 1, 2014. Dkt. No. 1. The Complaint alleges one count of disparate treatment race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). Id. at ¶¶ 17-24. Plaintiff requests that the Court enjoin Defendant from engaging in unlawful employment practices and award him compensatory damages, punitive damages, litigation expenses, and attorney's fees. Id. at pp. 7-8.

## STANDARD OF REVIEW

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and

present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

### DISCUSSION

Defendant now moves for summary judgment in its favor on Plaintiff's Title VII claim. Dkt. No. 18. Defendant contends that Plaintiff cannot establish two essential elements of his prima facie case: first, that he was qualified for the position that he held, and, second, that Defendant treated similarly

AO 72A
(Rev. 8/82)

situated employees outside of his minority class more favorably. Id. at pp. 6-8. Even if Plaintiff could make such a showing, Defendant argues, he cannot demonstrate that Defendant's legitimate, nondiscriminatory reasons for discharging him were merely pretext. Id. at pp. 8-15. Plaintiff has filed a Response urging the Court to deny Defendant's Motion because the evidence in the record sufficiently supports a prima facie case of discrimination and a finding of pretext. Dkt. No. 22. In support, Plaintiff relies primarily on the evidence of prior incidents involving Moss and Smith, as well as Plaintiff's repeated reports of production problems that management disregarded. Id. at pp. 8-11.[7]

Title VII prohibits employment discrimination on the basis of color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Under McDonnell Douglas Corp. v. Green, the plaintiff in a Title VII case bears the initial burden of establishing a prima facie case of race discrimination. 411 U.S. 792, 802 (1973). To do so, a plaintiff must show that she (1) belongs to a racial minority; (2) was subjected to an adverse employment action; (3) was treated less favorably than similarly situated, nonminority employees; and (4) was qualified for the job.

---

[7]  Plaintiff initially argues that he has properly exhausted his administrative remedies as to his discrimination claim, dkt. no. 22, pp. 5-6; however, as Defendant does not challenge Plaintiff's claim on exhaustion grounds, see dkt. no. 18, the Court finds no reason to address this issue here.

AO 72A
(Rev. 8/82)

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing McDonnell Douglas Corp., 411 U.S. at 802; Coutu v. Martin Cty. Bd. of Cty. Com'rs, 47 F.3d 1068, 1073 (11th Cir. 1995); and Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994)). This burden is not a heavy one, as the plaintiff need only put forth facts that permit an inference of discrimination under the McDonnell Douglas framework. Id. (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994)). However, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Id.

Should the plaintiff succeed in establishing a prima facie case, the burden shifts then to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802. If the defendant is able to do so, the plaintiff "must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas Corp., 411 U.S. at 804).

In the case at bar, it is undisputed that the first two elements of Plaintiff's prima facie case are satisfied, because Plaintiff, who is Black, is a member of a racial minority, and

his termination on July 19, 2012, constituted an adverse employment action. See Dkt. No. 18, p. 6; Dkt. No. 22, p. 7. Rather, at issue here is whether Plaintiff was treated less favorably than similarly situated, nonminority employees, and whether he was qualified for his job, under the third and fourth elements respectively.

In comparing an employer's treatment of a plaintiff to that of nonminority employees, "the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d at 1562 (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994); Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); and Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985)). In the context of allegedly discriminatory discipline, this requires showing that "the employees [were] involved in or accused of the same or similar conduct and [were] disciplined in different ways." Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)). "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id. at 1323 & n.2 (quoting Maniccia, 171 F.3d at 1368).

AO 72A
(Rev. 8/82)

Plaintiff has failed to put forth evidence that Moss, Smith, or any other nonminority employee was sufficiently similarly situated as to satisfy the third element of his prima facie case. Plaintiff points only to his deposition testimony that Moss, a White male, held the position of Shift Manager at the Plant and once took over Plaintiff's duties while he was on vacation. Dkt. No. 23, ¶ 8. Plaintiff related at his deposition that Moss failed to complete operations in his department by the USDA-mandated stop time and caused a Plant shutdown, but that he was not terminated and, instead, was required to meet with Plaintiff and other employees to discuss the incident and strategies to prevent its reoccurrence. Pl.'s Dep., 96:22-99:1. Plaintiff also has submitted deposition testimony indicating that Smith, a White female who worked in the packaging department, once misdated several packages of meat—the result of which was that the truck carrying these packages had to return to the Plant for relabeling prior to delivery, without Smith facing discharge. Id. at 122:16-123:11.[8]

Significantly, Plaintiff's evidence shows that Moss and Smith held different positions and had different responsibilities than Plaintiff. See Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 208 (11th Cir. 2008) (no valid

---

While Plaintiff admitted that he was unsure as to whether Smith or another employee made this error, Pl.'s dep., 122:25-123:4, Plaintiff fails to show a viable comparator based on this incident in any event.

AO 72A
(Rev. 8/82)

comparator where another employee "held a different position with job responsibilities" that were unlike those of the plaintiff). Moss was a Shift Manager, not the Production Supervisor in the cut-up, leg quarter, chiller, and re-hang department. See Dkt. No. 23, ¶ 8. The record reflects that Moss filled in for Plaintiff in this position while he was on vacation; however, it is undisputed that he did so only temporarily, and that his regular duties did not include supervising the production line and the employees in this department. See id. While Smith's precise job title is unclear, the evidence shows that she worked in the packaging area and held responsibilities relating to packaging, labeling, and dating the product—a position wholly dissimilar to Plaintiff's supervisory role in the cut-up, leg quarter, chiller, and re-hang department. See Pl.'s Dep., 122:16-123:11.

Additionally, the circumstances surrounding the incidents involving Moss and Smith varied drastically from Plaintiff's situation. While it is true that Moss's incident involved a production backup that caused a violation of the USDA cut-off time and a Plant shutdown, id. at 96:22-99:1, nothing suggests that Moss, unlike Plaintiff, had had several conversations and meetings in the preceding months regarding the need to comply with the USDA stop time to prevent a Plant shutdown and had received a company mandate reiterating this message just days

AO 72A
(Rev. 8/82)

before, cf. SUF, ¶¶ 19, 22, 25 ("We had meetings about that. . . . Everybody knew. Supervisors knew."). As to Smith, Plaintiff has offered no evidence that her misdating of meat packages violated any USDA policy; that recalling the truck to relabel these packages was similar to a complete Plant shutdown; or that this mistake cost the Plant thousands of dollars, cf. White aff., ¶ 15. Even if Plaintiff had introduced such evidence, there is nothing in the record indicating when the incident involving Smith took place, much less that it took place just after Smith had engaged in numerous conversations and meetings, and received a warning, about not taking the precise action that caused the incident. Indeed, neither White nor Phillips recalls any incidents in which employees—Moss and Smith included—violated policies right after receiving directives not to do so. See id. at ¶ 23; Phillips Decl., ¶ 5.

Nor is there any evidence that investigations into the Moss and Smith incidents revealed further grounds—beyond violating USDA or company policy—upon which to find these employees culpable. Unlike in Plaintiff's case, see SUF, ¶ 36, nothing indicates that management determined that either Moss or Smith had disregarded specific directions that had been given to them regarding the operations of their departments. The evidence likewise does not suggest that management found that these individuals had failed to properly notify USDA, FSIS, and

21

company officials of the impending crisis, or that they had failed to take ownership of the situation after the fact.  Cf. id.

Plaintiff also has not put forth evidence that the same decision-makers in his case handled the incidents involving Moss and Smith.  See Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) (employees are not similarly situated where their misconduct occurred under different supervisors, and the supervisors who took an adverse action against the plaintiff for the same misconduct were unaware of the prior instances).  The record reflects that two of the primary decision-makers in Plaintiff's investigation and termination, White and Phillips, did not begin working at the Plant until 2011.  White Aff., ¶ 3; Phillips Decl., ¶ 2.  While the timing of Moss's and Smith's incidents remains unclear, both White and Phillips have stated, under penalty of perjury, that they do not recall any incidents similar to Plaintiff's having taken place at the Plant.  White Aff., ¶ 23; Phillips Decl., ¶ 5.  Phillips, in particular, has indicated that she is unaware of any prior incidents involving Moss or Smith.  Phillips Decl., ¶ 6.

Nor does Plaintiff offer any other evidence that would allow for an inference of discrimination in the absence of comparator evidence.  Plaintiff has admitted that he never went to the human resources department or to upper management during

AO 72A
(Rev. 8/82)

his employment to complain of any kind of discriminatory or harassing treatment of him based on his race. SUF, ¶ 45. Rather, it is undisputed that Plaintiff's only basis for alleging discrimination is his termination, and he has acknowledged that "[n]obody said or indicated anything to [him] that his race was a factor at all in the [c]ompany's decision to terminate his employment." Id. at ¶ 43. While Plaintiff emphasizes that management ignored his repeated reports of production issues and failed to take corrective action, see dkt. no. 22, p. 9, these facts serve only to undermine the strength of management's reason for terminating Plaintiff and do not, in any way, change the very reason for termination itself. That is, even if management's actions in ignoring Plaintiff's reports suggest that perhaps Plaintiff was not solely to blame for the July 18, 2012, incident, these actions have no bearing on whether management acted with a discriminatory motive in terminating Plaintiff. See Mitchell v. Worldwide Underwriters Ins. Co., 967 F.2d 565, 567 (11th Cir. 1992) ("Even if the [c]ompany was wrong on its . . . determination, if that was the reason for the employment action, its error in that determination would not be a basis for claiming . . . discrimination." (citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for . . . a reason based on erroneous facts, or for no

reason at all, as long as his action is not for a discriminatory reason."))).

As Plaintiff does not point to any evidence of a similarly situated, nonminority employee, or any evidence that would otherwise permit an inference that Defendant discriminated against him on the basis of his race, Plaintiff fails to show that there is any genuine issue for the jury under the third element. In these circumstances, the Court need not proceed to the fourth element—his qualification for the job—to conclude that summary judgment is appropriate. See Holifield, 115 F.3d at 1562 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."). Defendant's Motion is, therefore, **GRANTED.**

### CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (dkt. no. 17) is **GRANTED** in its entirety. The Clerk of Court is hereby **DIRECTED** to enter the appropriate judgment and to close this case.

**SO ORDERED,** this 14TH day of March, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA